NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| KRISTEN AGNES, an infant by her guardian ad litems, ALBERT AGNES and LEONA AGNES and ALBERT AGNES and LEONA AGNES, individually, et al., : : : : : : Plaintiffs, : : v. : : E.I. DU PONT DE NEMOURS AND COMPANY, et al., : : : Defendants. : | **Hon. Dennis M. Cavanaugh** **OPINION** Civil Action No. 98-1405 (DMC) |

DENNIS M. CAVANAUGH, United States District Judge:

This matter having come before the Court upon motion by E.I. du Pont de Nemours and Company, et. al. ("DuPont")("Defendant") to enforce settlement and to enjoin Agnes, et. al. ("Agnes Plaintiffs") from pursuing their claims in New Jersey state court. Pursuant to Fed. R. Civ. P. 78, no oral argument was heard. After considering the submissions of all parties, it is the decision of this Court for the reasons herein expressed that Defendant's motion to enforce settlement and enjoin the Agnes Plaintiffs from pursuing their claims is **granted.**

I.  **BACKGROUND**[1]

Beginning in 1998, approximately 500 current or former residents of Pompton Lakes filed cases against DuPont asserting claims for property damage, personal injury, and medical monitoring based on alleged contamination from the Pompton Lakes Work Plant ("PLW"), a former DuPont manufacturing facility. The cases were consolidated and were pending before this Court from 1998

---

[1] The facts set-forth in this Opinion are taken from the Parties' statements in their respective moving papers.

to 2004, which is when this Court held a settlement hearing and issued an Order Dismissing Actions and Approving Settlement.  Recently, 113 Agnes Plaintiffs filed new suits in the Superior Court of New Jersey in Passaic County asserting claims related to the alleged contamination from PLW.

### A. Agnes v. DuPont

The Agnes Plaintiffs alleged that DuPont's operation of PLW contaminated the air, soil, and groundwater.  It was alleged that "DuPont's operations and waste disposal activities... caused the release of various hazardous materials and substances including VOCs [volatile organic compounds], PCBs [polychlorinated biphenyls], and heavy metals... into the environment, " and that DuPont "allow[ed] hazardous materials and substances ... to seep into the groundwater." (Ex. 2 to Dwyer Aff., Fourth Am. Compl. in *Agnes* (Mar. 24, 2000)).  The Agnes Plaintiffs also alleged that "DuPont dumped hazardous materials into unlined lagoons and holding ponds on the Site, thereby allowing hazardous substances to be evaporated into the air and/or seep into the soil and groundwater..." Id. Additionally, the Agnes Plaintiffs alleged that DuPont's operation of PLW exposed plaintiffs to contaminants in the environment, including in soil and groundwater.  Plaintiffs alleged that as a result of DuPont's actions, "plaintiffs' homes and basements, the soil and plaintiffs' yards and gardens, and the air and dust particles inhaled and ingested by plaintiffs were and are contaminated with hazardous materials and substances.  Said contamination has migrated to properties owned and utilized by plaintiffs."

The Agnes Plaintiffs asserted claims for personal injury, property damage/diminution in value, and medical monitoring, as well as compensatory and punitive damages.

### B. Settlement and Release

After holding a hearing on the proposed settlement, this Court entered an Order Dismissing Actions and Approving Settlement ("Order") on March 31, 2004.  The Order dismissed the cases with prejudice.  The Order also provided that this Court retained jurisdiction for the purpose of the

settlement and enforcement of its terms.

As part of the settlement, each plaintiff signed a Description of Settlement Offer ("settlement offer") and a release. Plaintiffs claiming present personal injury or property damage were allowed to participate in binding arbitration as part of the settlement. The personal injury and property damage plaintiffs were to proceed against DuPont in a single, private, binding arbitration wherein the arbitrator was authorized to make awards in accordance with the rules set by the parties. The settlement also provided that DuPont would make a $950 settlement payment to each plaintiff who did not participate in the personal injury portion of the arbitration.[2] Under the settlement, DuPont also provided a Medical Test Reimbursement benefit of up to $600 per person per year for each plaintiff who met certain agreed upon residency requirements.[3] All plaintiffs, regardless of whether or not they participated in the arbitration, were eligible for the Medical Test Reimbursement provided they satisfied the residency requirements. The Medical Test Reimbursement fund was established for 75 years.

As part of the settlement, the parties agreed that "plaintiffs will give releases and dismissals satisfactory to DuPont."[4] (Ex. 6 to Dwyer Aff., Settlement Offer, at 4). Each release included a

---

[2]This group of plaintiffs included both plaintiffs who did not participate in the arbitration at all and plaintiffs who participated only in the property damage portion of arbitration.

[3]The Medical Test Reimbursement benefit covers blood lead and mercury tests, immune globulin assays, and diagnostic X-rays or CT scans of the chest or abdomen.

[4]There were two release forms. Plaintiffs who participated in the personal injury arbitration, agreed to "dismiss his or her case with prejudice (meaning it cannot be filed again) and give a full release of all claims." [Ex. 6 to Dwyer Aff., Settlement Offer, at 4]. This group of plaintiffs signed one form of release [See e.g. Ex. 8 to Dwyer Aff., Pepper Release] , and 11 of the 113 plaintiffs at issue signed this form of release. Plaintiffs who obtained a cash payment and did not participate in the personal injury arbitration, agreed to "dismiss their case with prejudice and retain the right to sue in the future only for compensatory damages for malignant cancer manifested in the future, but shall release all other claims." [Ex. 6 to Dwyer Aff., Settlement Offer, at 4]. This group of plaintiffs signed another form of release, [See e.g. Ex. 9 to Dwyer Aff., Pantano Release], and 102 of the 113 plaintiffs at issue signed this form. Aside from the exception for "compensatory damages for malignant cancer manifested in the future" in

broad release of past, present, and future claims against DuPont related to PLW.

Specifically, each plaintiff agreed that in exchange for consideration he or she

> releases and gives up any and all claims and rights of whatever kind or description, including those claims that Releasor *ever had or may have had or may have in the future* as a result of any claimed injuries or damages resulting from exposure to any conditions, chemicals or materials originating on or from property now or heretofore owned, leased or possessed by E.I. du Pont de Nemours and Company in Pompton Lakes, New Jersey, (hereinafter referred to as "Pompton Lakes Works"), and including all claims *which have been made or which could have been made against Releasee, as well as any claims which can be made in the future, arising out of or related to alleged facts* set forth in the case Agnes v. DuPont, or out of any other actions relating to the Pompton Lakes Works, including all claims of which Releasor is aware or unaware.

(Ex. 8 to Dwyer Aff., Pepper Release ¶ 1 (emphases added); see also Ex. 9 to Dwyer Aff.,

Pantano Release ¶ 1.) The releases further state:

> This Release is in complete satisfaction of *all present and future claims* for pecuniary injuries suffered by Releasor and Releasor's survivors or a spouse/relative with a derivative claim, and specifically releases *all claims including, but not limited to, claims for past, present and future*: personal injuries, property damage, medical surveillance costs, claims for loss of or damage to quality of life, claims for diminution of property value, claims for emotional distress, claims for fear of cancer or other disease, claims for loss of wages, prospective earnings, companionship, consortium, funeral expenses and punitive damages, medical monitoring or any other form of relief . . . .

(Ex. 8 to Dwyer Aff., Pepper Release ¶ 2 (emphases added); see also Ex. 9 to Dwyer Aff.,

Pantano Release ¶ 2.)

The releases further provide that the plaintiff

> does expressly covenant and agree *forever to refrain from bringing any suit or proceeding at law or in equity against Releasee for any claim released herein*. Releasor covenants and agrees to dismiss the Agnes v. DuPont action and all other actions relating to claimed injuries or damages in connection with Pompton Lakes Works as to Releasee with prejudice and without costs.

(Ex. 8 to Dwyer Aff., Pepper Release ¶ 3 (emphases added); see also Ex. 9 to Dwyer Aff.,

---

the second form of release, the scope of the two release forms is largely identical. None of the 113 Agnes Plaintiffs has pled a claim for malignant cancer manifested since the release was signed, or any other personal injury, in the new state court lawsuits.

-4-

Pantano Release ¶ 3.)

The releases provide that "[t]his Release is intended to accomplish the *complete and permanent disengagement* of Releasee from all possible claims and litigation related to the matters referred to in this Release." (Ex. 8 to Dwyer Aff., Pepper Release ¶ 6 (emphases added); see also Ex. 9 to Dwyer Aff., Pantano Release ¶ 6.) Each plaintiff agreed that "he/she will not seek anything further from Releasee for the claims released herein." (Ex. 8 to Dwyer Aff., Pepper Release ¶ 7; see also Ex. 9 to Dwyer Aff., Pantano Release ¶ 7.)

The releases confirm that Releasor "has read this Release and the terms thereof and that Releasor has discussed this Release with Releasor's counsel who had fully explained to Releasor of its meaning." (Ex. 8 to Dwyer Aff., Pepper Release ¶ 13; see also Ex. 9 to Dwyer Aff., Pantano Release ¶ 13.)

Each Releasor "expressly represent[ed] that Releasor signed this Release willingly and voluntarily." (Ex. 8 to Dwyer Aff., Pepper Release ¶ 14; see also Ex. 9 to Dwyer Aff., Pantano Release ¶ 14.) Each release was signed by plaintiff(s) and plaintiffs' counsel and notarized. (Ex. 8 to Dwyer Aff., Pepper Release, at 5-6; see also Ex. 9 to Dwyer Aff., Pantano Release, at 5-7.) Finally, the releases provide that "[t]his Release may be pleaded as a full and complete defense to, and may be used as the basis for an injunction against, any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of this Release." (Ex. 8 to Dwyer Aff., Pepper Release ¶ 12 (emphasis added); see also Ex. 9 to Dwyer Aff., Pantano Release ¶ 12.)

In exchange for the release of claims against DuPont, the settlement agreement provided the Agnes Plaintiffs with benefits. The arbitration plaintiffs received the right to participate in arbitration and seek an award. The arbitration process occurred from November 2006 to March 2007, including 24 days of hearings, and at its conclusion the arbitrator issued a decision with respect

to the personal injury and property damage claims. Plaintiffs who did not participate in the personal injury arbitration received cash payments. Additionally, all Plaintiffs were provided with ongoing access to the Medical Test Reimbursement for up to 75 years. Plaintiffs were also reimbursed $550,000 in costs as part of the settlement. Finally, the settlement afforded Plaintiffs a fair, timely, and efficient resolution of their claims.

### C. New State Court Cases

Despite the settlement and releases, 113 of the Agnes Plaintiffs filed new cases against DuPont in the Superior Court of New Jersey asserting claims based on the alleged contamination from PLW. DuPont contends that the new cases assert claims that were released under the plain, unambiguous terms of the releases signed by these Plaintiffs in the Agnes cases.

The new complaints filed in state court allege contamination resulting from the groundwater plume at PLW. It is alleged that DuPont and a co-defendant "decided to permit toxic and hazardous volatile organic compounds ("VOCs") that migrated from both DuPont's former munitions plant in the Borough of Pompton Lakes, New Jersey" and co-defendant's site "to remain in the groundwater beneath Plaintiffs' homes and other property." (Ex. 10 to Dwyer Aff., Brautigan Compl.; Ex. 11 to Dwyer Aff., Iacolina Compl.). The new complaints also allege that "Defendants' mishandling of toxic and hazardous wastes, and their subsequent decisions not to remove VOCs from the Contaminated Residential Neighborhood over the decades caused those toxic chemicals to intrude into Plaintiffs' home and bodies through a phenomenon known as vapor intrustion." (Ex. 10 to Dwyer Aff., Brautigan Compl.; Ex. 11 to Dwyer Aff., Iacolina Compl.). Additionally, the new complaints allege that DuPont discharged chlorinated solvents "into soils and groundwater," and that the chemicals "intrude[d], as vapors, into the homes located in the Contaminated Residential Neighborhood." Ex. 10 to Dwyer Aff., Brautigan Compl.; Ex. 11 to Dwyer Aff., Iacolina Compl.).

The new complaints seek medical monitoring, property damages, and compensatory and

punitive damages.

### D. Motion to Enforce Settlement

DuPont moves for this Court to exercise its retained jurisdiction to enforce settlement and enjoin the new lawsuits as to the 113 Agnes Plaintiffs.

## II. JURISDICTION

Enforcement of a settlement agreement "requires its own basis for jurisdiction." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 378 (1994). A court has jurisdiction to enforce a settlement agreement when the parties' obligation to comply with the terms of the settlement agreement are made part of the order of dismissal. Id. at 381; see also Wright v. Prudential Ins. Co. of Am., 285 F. Supp. 2d 515, 520 (D.N.J. 2003) ("Courts have repeatedly affirmed the power of a court approving a settlement agreement to exercise its discretion to retain jurisdiction over the enforcement of that agreement, so long as it does so explicitly in the dismissal order."). The obligation to comply with the terms of the settlement agreement can be made part of the order of dismissal "either by separate provision (such as a *provision 'retaining jurisdiction' over the settlement agreement*) or by incorporating the terms of settlement agreement in the order." Kokkonen, 511 U.S. at 381 (emphasis added). In such a situation, jurisdiction exists because "a breach of the agreement would be a violation of the order." Id.

As stated above, this Court's Order dismissing the Agnes cases and approving settlement provided that "the Court will retain jurisdiction for the purpose of settlement and enforcement of its terms."[5] Through this provision, compliance with the terms of the settlement agreement was made

---

[5] This Court notes that the settlement offers and releases signed by the Plaintiffs also contemplated this Court retaining jurisdiction over enforcement of the agreement. The settlement offer signed by Plaintiffs provide that "[a]ny future action arising out of these matters will be filed and prosecuted exclusively in the U.S. District Court for the District of N.J. for purposes of enforcing this Agreement and all matters incidental." [Ex. 6 to Dwyer Aff., Settlement Offer, at 5]. The releases signed by Plaintiffs provide that "the United States District Court for the District of New Jersey, shall have exclusive jurisdiction and venue over the

part of the Order, and any breach of the agreement is a violation of the Order. Therefore, this Court has jurisdiction to enforce the settlement agreement.

**III.   RELEVANT LAW**

The All Writs Act authorizes federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). Under the All Writs Act, federal courts may grant a writ whenever a writ is "calculated in [the court's] sound judgment to achieve the ends of justice entrusted to it." Adams v. U.S. ex rel. McCann, 317 U.S. 269, 273 (1942).

"The authority the All Writs Act imparts to district courts is limited, however, by the Anti-Injunction Act." In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation, 369 F.3d 293, 305 (3d Cir. 2004)("Diet Drugs II"). The Anti-Injunction Act prohibits a federal court from granting "an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. "The Act 'is an absolute prohibition against enjoining state court proceedings, unless the injunction falls within one of three specifically defined exceptions.'" In re Prudential Ins. Co. of Am. Sales Prac. Litig., 314 F.3d 99, 103 (3d Cir. 2002)("Prudential II")(citing Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs, 398 U.S. 281, 286 (1970)). "The exceptions in the Anti-Injunction Act are to be construed narrowly." In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation, 282 F.3d 220, 233 (3d Cir. 2002)("Diet Drugs I").

---

enforcement of this Release and all matters incidental." [Ex. 8 to Dwyer Aff., Pepper Release ¶9; see also Ex. 9 to Dwyer Aff., Pantano Release ¶9]. The releases also provide that "the procedural rules and the substantive law of the State of New Jersey govern this Release and all matters incidental." [Ex. 8 to Dwyer Aff., Pepper Release ¶9; see also Ex. 9 to Dwyer Aff., Pantano Release ¶9].

"The two statutes act in concert, and '[i]f an injunction falls within one of [the Anti-Injunction Act's] three exceptions, the All-Writs Act provides the positive authority for federal courts to issue injunctions of state court proceedings.'" Diet Drugs II, 369 F.3d at 305 (citing In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 134 F.3d 133, 143 (3d Cir.1998)).

## IV.   DISCUSSION

A.   Settlement Agreement and the New State Cases

The interpretation and enforcement of the settlement agreements, and accompanying releases, is governed by New Jersey law.  "State law governs the construction and enforcement of settlement agreements in federal court." Excelsior Ins. Co. v. Pennsbury Pain Ctr., 975 F. Supp. 342, 348-49 (D.N.J. 1996).  Additionally, the releases here specify that they are governed by New Jersey law.

The enforceability of settlement agreements is governed by contract law. Met Life Ins. Co. V. Hayes-Green, 2008 WL 2119976, at *1 (D.N.J. May 20, 2008); Excelsior, 975 F. Supp. at 349. New Jersey law provides that "where the terms of a contract are clear or unambiguous there is no room for interpretation or construction and courts must enforce those terms as written." Impink ex. rel. Baldi v. Reynes, 396 N.J. Super. 553, 560 (App. Div. 2007).

A signed release, even a broad general release, is given considerable weight. Cooper v. Borough of Wenonah, 977 F. Supp. 305, 310, 311 (D.N.J. 1997).  "It is the general rule that where a party affixes his signature to a written instrument, *such as a release*, a conclusive presumption arises that he read, understood, and assented to its terms and he will not be heard to complain that he did not comprehend the effect of his act in the signing." Id. at 311-12.

New Jersey's law reflects its strong public policy in favor of enforcing settlements, which is "based upon the notion that the parties to the dispute are in the best position to determine how to resolve a contested matter in a way that is least disadvantageous to everyone." Brundage v. Estate

of Carambio, 195 N.J. 575, 601 (N.J. 2008). "In furtherance of this policy, our courts strain to give effect to the terms of a settlement wherever possible," and "settlements will usually be honored absent compelling circumstances." Id.; see also Baron v. Jersey City Incinerator Authority, 2009 WL 4798577, *4 (D.N.J. Dec. 7, 2009) ("In general, settlement agreements will be honored absent a demonstration of fraud or other compelling circumstances," and "clear and convincing proof" is required to vacate settlements.).

Here, each Agnes Plaintiff signed a settlement offer agreeing to dismiss his or her case with prejudice and give a full release of all claims.[6] The Agnes Plaintiffs also executed broad general releases wherein Plaintiffs expressly gave up all past, present, and future claims against DuPont related to PLW. The claims in the new state cases are based on the alleged contamination from DuPont's former manufacturing facility in Pompton Lakes, and are clearly encompassed in the settlement agreement and releases executed by the Agnes Plaintiffs.

The Agnes Plaintiffs make several arguments against the enforcement of the settlement and releases, but none are persuasive. The Agnes Plaintiffs argue that the releases should not be enforced on public policy grounds. However, Plaintiffs have failed to identify a compelling reason to set aside the settlement agreement and releases, particularly in light of New Jersey's strong public policy in favor of enforcing settlement agreements. The Agnes Plaintiffs also argue the releases are voidable based on mutual mistake, and therefore should not be enforced. This Court finds that the language of the releases is clear, and unambiguous, and therefore there this Court must enforce the terms as written. Impink ex. Rel. Baldi, 396 N.J. Super. at 560; see also Fisher Dev. Co. V. Boise Cascade

---

[6]As noted previously, the Plaintiffs who chose to arbitrate their personal injury claims released all claims against DuPont, and those Plaintiffs who did not participate in the personal injury arbitration agreed to release all claims except those for malignant cancer manifested in the future. Since none of the pending state court case claims involve manifestations of malignant cancer, the Court will refer to the release of all claims for the purposes of this Opinion.

Corp., 37 F.3d 104, 109 (3d Cir. 1994) (holding that, under New Jersey law, when a general release is unambiguous the court will "decline to consider extrinsic evidence which is allegedly in conflict with the express terms of the release"); Estate of Maglione v. Gulf Oil Corp., 2007 WL 527940, *3 (N.J. Super. Ct. App. Div. Feb. 22, 2007) ("When the express language of the agreement clearly states it terms, the parties will be bound by those terms and will be precluded from alleging a secret intent to the contrary in an effort to vary the terms.").

This Court finds that the settlement and releases are enforceable, and that the settlement and releases bar the new state court claims.

### B. Injunction of State Court Proceedings

This Court has "authority under the All Writs Act... to protect [its] jurisdiction by enjoining state court proceedings that interfere with a judicially approved settlement." Diet Drugs II, 369 F.3d at 297; see also id. at 298 ("Emphatically, the District Court is empowered to protect its jurisdiction and effectuate the settlement agreement."). However, as noted above, this Court's authority under the All Writs Act is proscribed by the Anti-Injunction Act, and this Court may only enjoin state court proceedings based on one of the three recognized exceptions to the Anti-Injunction Act. This Court finds that the injunction sought by DuPont is permitted under two exceptions to the Anti-Injunction Act, specifically the 'necessary in aid of jurisdiction' and the 'protect or effectuate its judgments' exceptions.

#### 1. 'Necessary in Aid of Jurisdiction' Exception

"[A]n injunction is necessary in aid of a court's jurisdiction only if 'some federal injunctive relief may be necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case.'" Diet Drugs II, 369 F.3d at 306 (internal citations omitted). Under

the 'in aid of jurisdiction exception,' a federal court that retains jurisdiction over a settlement agreement may enjoin collateral attacks in state court in order to enforce the provisions of that settlement agreement. Id. "Allowing state court actions to run afoul of [the settlement agreement] would fatally subvert it and render the agreement (and the Court's jurisdiction) nugatory." Id.; see also In re Prudential Ins. Co. of Am. Sales Prac. Litig., 261 F.3d 355, 365 (3d Cir. 2001)("Prudential I")(finding that the aid of jurisdiction exception "should be construed to empower the federal court to enjoin a concurrent state proceeding that might render the exercise of the federal court's jurisdiction nugatory") (internal citations omitted). Therefore, "the district court's ability to give effect to [the settlement agreement] is necessary in aid of its jurisdiction." Diet Drugs II, 369 F.3d at 306.

>As the Third Circuit explained in Prudential II,

> The settlement here represented a herculean effort to provide a fair and consistent framework for the resolution of millions of claims. The comprehensive procedures implemented for this purpose were integral to this effort. Permitting continued litigation of these claims would 'unsettle' what had been thought to be settled, and would disrupt carefully constructed procedures for individual dispute resolution. Allowing comprehensive settlements to be undermined in this way would undeniably deter similar settlements in the future.

314 F.3d at 105.

Plaintiffs argue that the 'in aid of jurisdiction' exception no longer applies once the settlement has been approved. This argument is unavailing. Third Circuit precedent shows that when a district court retains jurisdiction to enforce a settlement agreement, the district court's authority to enjoin state court proceedings under the 'in aid of jurisdiction' exception extends beyond the time of settlement. See e.g. Diet Drugs II, 369 F.3d at 299-304 (affirming district court's authority, under the 'in aid of jurisdiction' exception, to enjoin state court proceedings after final order approving settlement); Prudential II, 314 F.3d at 100, 103-05 (same). This rule comports with

common sense; if the court retains jurisdiction over the settlement agreement, the authority to act in aid of that jurisdiction must also necessarily extend beyond the date the settlement is approved.

The *Agnes* cases involved complex litigation, and were resolved through a comprehensive and carefully negotiated settlement agreement. As noted above, this Court retained jurisdiction over the enforcement of that settlement agreement. Collateral attacks in state court would undermine the settlement and resolution of the litigation, deter similar settlement in the future, and render the settlement agreement, as well as the jurisdiction retained by this Court, nugatory. Therefore, this Court finds that it may enjoin the state court proceedings under 'the in aid of jurisdiction' exception.

### 2. 'Protect or Effectuate its Judgments' Exception

This Court also finds that an injunction of the state court proceedings may likewise be justified under the 'protect or effectuate its judgments' exception. "The 'protect or effectuate its judgments' exception, known as the 'relitigation exception,' is 'founded in the well-recognized concepts of *res judicata* and collateral estoppel." Diet Drugs II, 369 F.3d at 305 (internal citations omitted). The purpose of the relitigation exception is to allow "a federal court to prevent state litigation of an issue that previously was presented to, and decided by, the federal court." Id.; see also Prudential I, 261 F.3d at 367-68 ("A district court has the power to enforce an ongoing order against relitigation so as to protect the integrity of a complex class settlement over which it retained jurisdiction."). "An essential prerequisite for applying the relitigation exception is that the claims or issues which the federal injunction insulates from litigation in state proceedings [must] actually have been decided by the federal court." Prudential I, 261 F.3d at 364 (citing Chick Kam Choo v. Exxon Corp., 486 U.S. 140, 147 (1988)). "Judicially approved settlement agreements are considered final judgments on the merits for the purposes of claim preclusion." Toscano v. Conn. Gen. Life Ins. Co., 288 Fed. Appx. 36, 38 (3d Cir. 2008)."The express terms of a settlement agreement, not merely

the terms of the judgment, determine the bounds of preclusion after a settlement." Id.; see also Prudential I 261 F.3d at 366 ("It is now settled that a judgment pursuant to a class settlement can bar later claims based on the allegations underlying the claims in the settled class action... we have endorsed [this] rule because it serves the important policy interest of judicial economy by permitting parties to enter into *comprehensive settlements that prevent relitigation of settled questions at the core of a class action*.") (internal citations omitted) (emphasis added).

In Prudential I, the Third Circuit approved an injunction of state court proceedings under the relitigation exception. The Third Circuit found that the injunction was appropriate based on the preclusive effect of the settlement agreement. Prudential I, 261 F.3d at 366-370. In approving the injunction, the Third Circuit "examine[d] the text of the Class Notice and, more particularly, the Class Release to determine the propriety of the injunction." Id. at 366. "The notice of settlement specifically advised each potential class member, however, that acceptance of the settlement would prevent any future assertion of claims *that had been or could have been asserted* with respect to any policy for which the class member chose to settle." Diet Drugs II, 369 F.3d at 305 (describing Prudential I). The notice specifically referenced the release, and the broad release provided that the plaintiffs

> release and discharge the Releasees from, any and all causes of action, claims, damages, equitable, legal and administrative relief, interest, demands or rights, of any kind or nature whatsoever ... that have been or could have been, may be or could be alleged or asserted now or in the future... on the basis of, connected with, arising out of, or related to, in whole or in part, the Released Transactions and servicing relating to the Released Transactions.

Prudential I, 261 F.3d at 366. The Third Circuit found that since the release was incorporated into the final judgment, "it has both claim preclusive and issue preclusive effect." Id. at 367. The release also precluded class members "from relying upon the common nucleus of operative facts underlying claims on the Class policies to fashion a separate remedy against [defendant] outside the confines

-14-

of the Released claims." Id. The Third Circuit agreed with the district court's finding that allowing the claims in state court to proceed "would allow an end run around the Class settlement by affording them... an opportunity for relitigation of released claims." Id. (internal citations omitted).

Here, as in Prudential I, the parties entered into a comprehensive settlement agreement, and as part of that agreement the Plaintiffs executed broad releases of claims relating to contamination at PLW. The express terms of settlement agreement and the releases signed by the Plaintiffs preclude the claims currently pending in state court. Here, as in Prudential I, allowing the state court cases to proceed "would allow an end run around" the settlement and would afford the Agnes Plaintiffs "an opportunity for relitigation of the released claims." Prudential I, 261 F.3d at 367. Therefore, this Court has the authority to enjoin the state court proceedings under the relitigation exception.

Plaintiffs advance several conclusory arguments as to why the relitigation exception does not apply, but none are persuasive. Plaintiffs argue that "vapor intrusion was not litigated in *Agnes*, and that action was dismissed following the settlement between DuPont and the plaintiffs." Pl. Br. in Opposition, at 24. However, as discussed above, the vapor intrusion claims were contemplated in the broad language of the Releases signed by the Plaintiffs, which were part of the settlement agreement, and it is "the express terms of a settlement agreement, not merely the terms of the judgment, [that] determine[s] the bounds of preclusion after a settlement." Toscano, 288 Fed. Appx. at 38.

Plaintiffs also argue that Prudential I is inapplicable because that case involved a nationwide class action and the "specific and express conditions of the district court's order approving a settlement," Pl. Br. in Opposition, at 24, whereas this case involves releases signed by the parties and federal subject matter jurisdiction was based on diversity. Plaintiffs provide no support for their

argument, and there is nothing in Prudential I or the Anti-Injunction Act to suggest that the relitigation exception only applies to nationwide class actions or, alternately, that it is inapplicable in cases where federal subject matter jurisdiction is based on diversity.

Finally, Plaintiffs argue that the vapor intrusion claims do "not threaten the Court's order of dismissal in this action." Id. However, this Court retained jurisdiction over the settlement agreement. The settlement agreement bars the Agnes Plaintiffs from bringing suits like the ones at issue here, and a violation of the settlement agreement is a violation of this Court's order. Therefore, if this Court allowed the state court cases to proceed, it would not only be allowing the Agnes Plaintiffs to relitigate their released claims, but also to violate this Court's order.

C. Equitable Requirements for an Injunction

"[A]s with any injunction, traditional principles of equity apply," and "[a]ny court determining whether to issue an injunction must consider several factors that guide and constrain its equitable authority." Diet Drugs II, 369 F.3d at 297; but see Prudential I, 261 F.3d at 363-70 (affirming injunction under All Writs Act and Anti-Injunction Act without examining equitable requirements); Prudential II, 314 F.3d at 103-05 (same). "The terms of any injunction, for example, must be commensurate with the violation the court seeks to remedy." Id.

This Court finds these requirements are met here. The Agnes Plaintiffs' state court proceedings are a breach of the settlement agreement and releases negotiated and executed by the Agnes Plaintiffs. This is a legal wrong that can be remedied by an injunction. An injunction of the state court proceedings is commensurate with the violation sought to be remedied. The parties agreed, as is evidenced by the terms of the settlement agreement and releases, that DuPont would be immune for suits based on PLW and that an injunction would be the proper remedy for a future suit.

**V.      CONCLUSION**

For the foregoing reasons, Defendant's motion to enforce settlement and enjoin the 113 Agnes Plaintiffs from pursuing their claims in New Jersey state court is **granted**.

    S/ Dennis M. Cavanaugh
    Dennis M. Cavanaugh, U.S.D.J.

Date:           March 31, 2011
Original:      Clerk's Office
cc:              All Counsel of Record
               The Honorable J.A. Dickson, U.S.M.J.
               File